**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHRISTOPHER CARZOLI;<br>Staniční 1377<br>156 00 Praha 5<br>Czech Republic | )<br>)<br>)<br>)<br>) |
| MANFRED HANSPETER; and<br>V Pěšinách 177<br>251 64 Mnichovice<br>Czech Republic | )<br>)<br>)<br>)<br>) |
| DONALD MAY<br>Babočková 725<br>149 00 Praha 11<br>Czech Republic | )<br>)<br>)<br>)<br>) |
| | )　　**COMPLAINT**<br>) |
| Plaintiffs, | )　　**JURY TRIAL DEMANDED**<br>) |
| v. | )<br>) |
| RFE/RL, INC.,<br>1201 Connecticut Ave., NW, #400<br>Washington, District of Columbia 20036 | )<br>)<br>)<br>)<br>) |
| Defendant. | )<br>) |

Christopher Carzoli, Manfred Hanspeter, and Donald May (hereinafter collectively the ("Plaintiffs"), by and through their undersigned attorneys, bring this  Complaint for Declaratory Judgment, Damages, Injunctive Relief, and Other Appropriate Relief against their employer, RFE/RL ("Defendant"), and in support thereof state:

## INTRODUCTION

1.     Plaintiffs bring this action to address violations of the anti-retaliation provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), against Defendant.

2.     Plaintiffs learned that L88 Investments ("L88"), RFE/RL's landlord, engaged in fraud against the United States Government by soliciting and collecting payments from the United States Government to perform property management and operation services but failing to use the collected funds for their intended purpose.  Plaintiffs also learned that Defendant was complicit in the fraudulent activity.

3.     Plaintiffs specifically disclosed their concerns regarding Defendant and L88's aforementioned fraudulent activity to Defendant internally and then externally to the Department of State's Office of Inspector General ("OIG"), the Federal Bureau of Investigations ("FBI"), and the Broadcasting Board of Governors ("BBG"); and Defendant, aware that Plaintiffs engaged in protected activity, retaliated against Plaintiffs by continuously diminishing their duties and responsibilities, systematically undermining their authority, providing unjustified poor performance evaluations, failing to provide Plaintiffs with merit-based bonuses or salary increases that were afforded to other employees, and demoting them. Defendant's retaliatory actions are ongoing.

## JURISDICTION AND VENUE

4.     This Court maintains subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' action arises under the anti-retaliation provisions of the FCA, 31 U.S.C. § 3729, *et seq*.

5.     This Court maintains personal jurisdiction over the Defendant because Defendant maintains offices in the District of Columbia, located at 1201 Connecticut Ave., NW, #400, Washington, District of Columbia 20036, and purposely avails itself of the privilege of conducting activities within the District of Columbia.

6.     This Court is the proper venue pursuant to 28 U.S.C. § 1391(b)(1) because Defendant maintains residency in the District of Columbia and is subject to this Court's personal jurisdiction.

## THE PARTIES

7.     Christopher Carzoli, Plaintiff, has worked for Defendant RFE/RL since November 1992 and is presently employed by Defendant RFE/RL.

8.     Christopher Carzoli is an employee within the meaning of the FCA, 31 U.S.C. § 3730(h).

9.     Donald May, Plaintiff, has worked for RFE/RL since 2004 and is presently employed by Defendant RFE/RL.

10.     Donald May is an employee within the meaning of the FCA, 31 U.S.C. § 3730(h).

11.     Manfred Hanspeter, Plaintiff, has worked for Defendant RFE/RL since 1988 and is presently employed by Defendant RFE/RL.

12.     Manfred Hanspeter is an employee within the meaning of the FCA, 31 U.S.C. § 3730(h).

13.     Defendant RFE/RL is an entirely federally-funded broadcasting service, established in 1950, for the purpose of bringing free press to former-Soviet controlled countries during the Cold War.  Today, RFE/RL provides news to countries where freedom of the press is limited or the sharing of information is heavily censored and maintains offices around the world, including offices in the District of Columbia and offices located in the Czech Republic at Vinohradska 159A 100 00 Prague 10, Czech Republic.

14.     RFE/RL is a federal grantee of the Broadcasting Board of Governors, located at 330 Independence Avenue, SW, Washington, DC 20237.

15.     To obtain funding for RFE/RL, BBG submits a line item request for RFE/RL as part of its budget requests to Congress.

## PROCEDURAL HISTORY

16.     On September 19, 2016, Plaintiffs Carzoli and Hanspeter, filed a complaint in United States District Court for the District of Columbia as *qui tam* relators.

17.     The September 19, 2016 complaint alleged violations of the FCA and named as Defendants L88 and Robert Cristiano, Principal at L88, John Todoroki, Principal at L88, John Giambalvo, former RFE/RL Chief Financial officer and Acting CEO of RFE/RL, and Nenad Pejic, current Acting President of RFE/RL, in their individual capacities.

18.     The complaint was filed under seal and the case remained sealed until July 9, 2018.

19.     On July 10, 2018, Plaintiffs Carzoli and Hanspeter requested that the case be dismissed without prejudice.  On July 30, 2018, the action was dismissed without prejudice.

## STATEMENT OF FACTS

20.     Defendant RFE/RL hired Plaintiff Hanspeter in 1988 as Laboratory Engineer. Plaintiff Hanspeter was later promoted to Senior Engineer and, in or around 1997, Director of Telecommunications and Network.

21.     Plaintiff Hanspeter served in the position of Director of Telecommunications and Networks for approximately twenty years until 2015. As Director of Telecommunications and Networks, Mr. Hanspeter and his staff of ten employees were charged with ensuring the comprehensive, integrated, reliable, and high-equality local area networking, network facilities

infrastructure, internet access, high-performance networking, network security, remote access to corporate IT service, and telecommunications for RFE/RL.

22.     Between 1988 and 2015, Plaintiff Hanspeter routinely received the highest performance ratings, and corresponding performance bonuses, as well as regular salary increases.

23.     In 1997, Plaintiff Hanspeter signed a "split" employment agreement with RFE/RL.

24.     The "split" employment agreement explicitly split Plaintiff Hanspeter's designated place of work between RFE/RL's offices in Washington, D.C. and RFE/RL's offices in Prague, Czech Republic.

25.     Specifically, Plaintiff Hanspeter signed two employment agreements with RFE/RL, constituting the "split" employment agreement.   Both agreements were between Plaintiff Hanspeter and "RFE/RL, Inc., 1201 Connecticut Avenue, NW, Washington, D.C. 20036." One employment agreement stated that Plaintiff Hanspeter's designated "place of work will be located at RFE/RL, Inc., 1201 Connecticut Avenue, N.W., Washington, D.C. 20036" and, RFE/RL paid Plaintiff Hanspeter a portion of his salary pursuant to that agreement.   The other employment agreement, signed at the same time, stated Plaintiff Hanspeter's designated "place of work will be located at RFE/RL, Inc., Vindohradska 1, Prague 1, Czech Republic" and RFE/RL paid Plaintiff Hanspeter the remaining portion of his salary under that agreement.

26.     Both employment agreements explicitly state that "this agreement is governed by the laws of the United States.  Furthermore, all conditions of employment are governed by the applicable laws of the United States, the laws of the District of Columbia or the policies of the Company."

27.     Plaintiff Hanspeter's employment agreement states that the offices in Washington, D.C. are RFE/RL's corporate headquarters.

28.      Defendant RFE/RL hired Plaintiff Carzoli in or about November 1992 as a transmitter operator. Plaintiff Carzoli subsequently assumed the role of acting Station Manager of the Biblis and Lampertheim, Germany transmitting stations.  RFE/RL later promoted Plaintiff Carzoli to Deputy Director of Broadcast Operations, then Director of Broadcast Operations, and then to Deputy Director of Technology in Prague, the Czech Republic.

29.      Plaintiff Carzoli served as Deputy Director of the Technology Division from 2003 to 2015.  As Deputy Director of Technology, Plaintiff Carzoli was responsible for the day-to-day operations of the RFE/RL's Technology Division and supervised approximately ninety employees at any given time.

30.      Between 1992 and 2015, Plaintiff Carzoli routinely received the highest performance ratings, and corresponding performance bonuses, as well as regular salary increases.

31.      In 1997, Plaintiff Carzoli signed a split employment agreement with Defendant RFE/RL.

32.      Upon information and belief, the employment agreement signed by Plaintiff Carzoli was nearly identical to Plaintiff Hanspeter's employment agreement.

33.      The "split" employment agreement explicitly split Plaintiff Carzoli's designated place of work between Defendant RFE/RL's headquarters in Washington, D.C. and RFE/RL's offices in Prague, Czech Republic.

34.      RFE/RL paid Plaintiff Carzoli a portion of his salary pursuant to the agreement designating his place of employment at Defendant's headquarters in D.C. and the remaining portion of his salary pursuant to the agreement designating his employment at RFE/RL's offices in Prague, Czech Republic.

35.     Plaintiff May began his employment with Defendant RFE/RL in or about November 2004 as the Director of the Operations Center, which routed all broadcast signals in and out of RFE/RL and ensured all recorded programming was broadcast on air.

36.     RFE/RL promoted Plaintiff May to Director of Technical Operations in 2008. In this position, Plaintiff May's responsibilities included overseeing facilities management and the operations center, which required him to frequently review and approve any facilities invoices. Later, Plaintiff May also assumed management of RFE/RL's broadcast engineering group, which was responsible for the installation and repair of RFE/RL's facility equipment.  In doing so, Plaintiff May maintained his title of Director of Technical Operations.

37.     Between 2004 and 2015, Plaintiff May routinely received the highest performance ratings, and corresponding performance bonuses, as well as regular salary increases.

38.     In 2004, Plaintiff May signed a "split" employment agreement with Defendant RFE/RL.

39.     The "split" employment agreement explicitly split Plaintiff May's designated place of work between RFE/RL's headquarters in Washington, D.C. and RFE/RL's offices in Prague, Czech Republic.

40.     Specifically, Plaintiff May signed two employment agreements, constituting the "split" employment agreement. One employment agreement stated that Plaintiff May's "place of work will be located at RFE/RL, Inc., 1201 Connecticut Avenue, N.W., Washington, D.C. 20036" and, at all times relevant, Defendant RFE/RL paid Plaintiff May a portion of his salary pursuant to agreement.  The other employment agreement, signed at the same time, stated Plaintiff May's "place of work will be located at RFE/RL, Inc., Vindohradska 1, Prague 1, Czech Republic" and Defendant RFE/RL paid Plaintiff May the remaining portion of his salary pursuant to that

agreement. Both agreements were between Plaintiff May and "RFE/RL, Inc., 1201 Connecticut Avenue, NW, Washington, D.C. 20036."

41.     Both employment agreements signed by Plaintiff May in 2004 explicitly stated that "[t]he parties understand that the laws of the United States govern this agreement.  Furthermore, all conditions of employment are governed by the applicable laws of the United States, the laws of the District of Columbia or the policies of the Company."

42.     In their respective roles, each Plaintiff was entrusted with oversight of decisions regarding the spending and purchasing in Defendant's technology division.

43.     During Plaintiffs' many years of employment, RFE/RL did not raise any serious performance concerns about Plaintiffs. To the contrary, Plaintiffs always received excellent performance reviews with the highest or second-highest ratings and frequently received performance awards and bonuses.

44.     Throughout their employment, Plaintiffs regularly communicated with staff at Defendant RFE/RL's offices in Washington, D.C.

45.     Throughout their employment, Plaintiffs traveled periodically to Washington, D.C. as part of their normal duties.

46.     In or about June 2012, L88 Investments ("L88") purchased the building housing Defendant RFE/RL's headquarters. Thereafter, L88 and Defendant RFE/RL entered a lease agreement.  Under the agreement, L88 was responsible for paying all building maintenance, operations, and utility bills and associated costs using funds collected from a U.S. Government grantee, which were appropriated by Congress.

47.     Defendant paid the building's utilities and maintenance costs directly to L88 in advance, and using these payments, L88 was to pay the utilities, building maintenance, and other operations costs to the service providers and various vendors, respectively.

48.     On or about May 10, 2013, Plaintiff Carzoli learned of discrepancies in L88's invoicing and that L88 had removed the Facilities Management Department's access to Defendant's Building Management System ("BMS") and to its Google Doc accounts, which recorded building management and utilities payments to reconcile potential discrepancies.

49.     Plaintiff Carzoli emailed RFE/RL's Interim Chief Executive Officer, John Giambalvo, and its then-Acting General Counsel, Ben Herman, to report his concern that L88 was submitting false invoices and failing to comply with the terms of the lease agreement. Specifically, Plaintiff Carzoli reported the discrepancies in invoices and that the Facilities Management Department could not verify if "payments [were] invoiced correctly."  Plaintiff Carzoli noted that "L88 seems to want absolutely no scrutiny of their activities."

50.     Both Giambalvo and Herman were employed at Defendant's office in Washington, D.C.

51.     Neither Giambalvo nor Herman responded to Plaintiff Carzoli's complaints. Plaintiffs Carzoli and May continued to communicate about similar concerns, including about L88's invoicing practices, with Giambalvo and others in senior management, throughout 2013.

52.     Upon information and belief, Giambalvo eliminated any substantive oversight of L88's invoicing practices by RFE/RL.

53.     In or around October 2013, William Key resigned from his position of Director of Corporate Security at RFE/RL and joined L88 as a vice president.  Upon information at belief, at the time he joined L88, Key was aware of Plaintiffs' protected activity.

54.     Over the course of the next several years, Plaintiffs learned that L88 engaged in additional fraudulent acts related to their invoicing, and collecting, funds appropriated by Congress without providing the contracted services or products.  For example, in or about June 2014, the building facilities management company, KART, abruptly stopped providing services to RFE/RL because L88 failed to pay the invoices.

55.     Similarly, the building's cleaning services company, RPM, halted its cleaning services of RFE/RL headquarters in or about August 2015 because L88 also failed to pay its invoices.  Plaintiffs also learned that the building's maintenance company, Rossi, terminated its contract with RFE/RL due to L88's nonpayment and the electric company threatened to terminate service if it was not paid.

56.     On several occasions, vendors complained directly to Plaintiffs about L88's failure to pay them for the services provided. Plaintiffs ultimately learned that approximately forty invoices, all of whom provided services to RFE/RL, had not been properly compensated by L88 despite the fact that Defendant had provided the funds, as appropriated by Congress, to L88.  In fact, L88 never paid most of the property management vendors as required by the contract with RFE/RL.

57.     Plaintiffs also learned that L88 requested RFE/RL's approval of the development of a new TV Studio, which would provide an additional $300,000 in funds to be distributed to L88. Upon information and belief, RFE/RL's senior management, including Giambalvo, advocated for the additional funds to be distributed to L88.

58.     After no action was taken by RFE/RL's management officials to abate the improper invoicing practices of L88 and the other mismanagement concerns, and in fact, RFE/RL senior management continued to discourage scrutiny of L88's invoicing practices and compliance with

the lease agreement, Plaintiffs jointly complained to Andre Mendes, then BBG Chief Information Officer/Chief Technology Officer ("CIO/CTO"), in early 2014 about the fraudulent activity, described in the paragraphs above.

59.     Upon information and belief, at all times relevant, Mendes' place of work was BBG's offices in Washington, D.C.

60.     Upon information and belief, Mendes discussed Plaintiffs' complaints with Defendant's senior management, including Giambalvo.

61.     Upon information and belief, as both Mendes and Giambalvo worked in Washington, D.C., these conversations occurred in Washington, D.C.

62.     Because Giambalvo failed to sufficiently resolve the concerns raised by Plaintiffs, Mendes brought Plaintiffs' complaints to the attention of BBG's Board, located in Washington D.C.

63.     On or about September 12, 2014, BBG's Board ordered an internal investigation into L88's misconduct and the issues raised by Plaintiffs.

64.     The investigation, conducted by Herman, occurred in or about October 2014. Plaintiffs each participated in the internal investigation and communicated their concerns directly to Herman.

65.     Upon information and belief, the majority of the investigation was conducted in Washington, D.C.

66.     Both Herman and Giambalvo were aware that Plaintiffs had complained to BBG and that their actions resulted in BBG's instruction to conduct an internal investigation.

67.     During the internal investigation, Plaintiffs disclosed their concerns about the potentially unethical relationship between L88 leadership and RFE/RL leadership, including the

intentional lack of oversight, which resulted in L88's fraudulent conduct, RFE/RL's and L88's lack of transparency about their decision-making, and L88's and RFE/RL's mismanagement and fraud including concerns about the failure of L88 to properly pay invoices despite having allocated funds from a U.S. Government grantee for such expenditures.

68.     On or about October 24, 2014, BBG's General Counsel submitted a report to BBG's Board that criticized RFE/RL's and L88's relationship and concluded that some of Defendant and L88's activities violated federal law and Defendant's ethics rules. The report explicitly included Plaintiffs' disclosures.

69.     Plaintiffs continued to provide information to Herman through the beginning of 2015.

70.     Almost immediately after the investigation's completion and after Plaintiffs discovered, reported, and protested the fraudulent practices, Defendant's senior officials began making unjustified personnel changes, as described below.

71.     Upon information and belief, many of these decisions were made at RFE/RL's offices in Washington, D.C. and by senior management, including Giambalvo and Herman, who worked at RFE/RL's Washington, D.C. office.

72.     In or about October 2014, then-Co-interim-Chief Executive Officers Giambalvo and Nenad Pejic inexplicably hired Sardy Bernard as a "consultant" to assess Defendant's Technology Division despite the fact that the Division had been performing successfully.

73.     In his consultant report of October 31, 2014, just weeks after the internal investigation concluded, Bernard conveniently advised RFE/RL to create a Chief Technology Officer ("CTO") position, which encompassed many of the duties performed by Plaintiffs.

74.     In November 2014, less than a month after the internal investigation concluded, Giambalvo instructed the then-Human Resources Director to send him a list of employees who received the highest performance ratings.

75.     Shortly after the Human Resources Director forwarded Giambalvo the list he requested, the Director of Technology was directed to retroactively downgrade the ratings of some of the Technology Division's staff.

76.     The Director of the Technology Division selected five employees to downgrade, three of which were the Plaintiffs.  These names were forwarded to Giambalvo, who objected to the inclusion of two employees who had **not** raised concerns about RFE/RL and L88's relationship and conduct.  Upon information and belief, only Plaintiffs were selected to have their performance ratings downgraded.

77.     Defendant also hired Susan Reed Jackson as Director of Technical Operations in January 2015.  Jackson's position mirrored many of Plaintiff May's responsibilities and effectively made Plaintiff May's job obsolete.

78.     Ms. Jackson was also assigned additional duties within the Technology Division, including all of the Division's bureau projects, hiring, and technology purchasing, which undercut Plaintiff Carzoli's duties.

79.     Around the same time, Giambalvo removed the Network Team from Plaintiff Hanspeter's oversight without justification.  Giambalvo placed the Network Team within the Internet Team directly under his office, and appointed Ray Ludendorff, Plaintiff Hanspeter's Deputy Director, to head the Network department, significantly diminishing Plaintiff Hanspeter's responsibilities and authority.

80.     To date, Defendant has not hired a new Deputy Director to replace Ludendorff and assist Hanspeter.

81.     After RFE/RL's management continued to ignore Plaintiffs' complaints about L88's misconduct and fraud, Plaintiffs jointly wrote to the State Department's Office of Inspector General ("OIG"), located in Washington, D.C., and the Federal Bureau of Investigation ("FBI") in or about February 2015 to report their concerns.  In their joint letter, they expressed concerns regarding "the mismanagement and possible malfeasance in the spending of significant portions of [RFE/RL]'s $100 million annual budget" and about L88's "unusual level of unprecedented involvement" in the day-to-day activities of RFE/RL.  Plaintiffs further highlighted how L88's and Defendant's practices directly impacted the operational and physical security of RFE/RL and the possible conflict of interest created by the alignment of RFE/RL and L88's corporate offices within Defendant's building and headquarters.  Plaintiffs' letter also informed OIG and the FBI that a "non-profit, tax-payer funded […] organization is being leveraged for the financial gains of a third party," and that L88's officers improperly represented themselves as associates of RFE/RL in meetings with government officials.

82.     Upon information and belief, both the OIG and FBI commenced an investigation into Plaintiffs' allegations.  Plaintiffs subsequently provided the OIG and FBI with documents and details supporting their complaints about the fraud and mismanagement of funds, including information related to the vendor invoices that remained unpaid despite RFE/RL having provided to L88 funds allocated by Congress for such purposes.

83.     Upon information and belief, OIG's investigation was conducted primarily in Washington, D.C. and likely included interviews and investigation into Defendant's senior management.

84.     In the months following Plaintiffs disclosures to the FBI and OIG, Defendant unjustifiably continued to obviate Plaintiffs' roles and systematically exclude them from decisions they had previously been involved in.  In or about July 2015, Defendant created the CTO position Bernard had recommended in his October 2014 report and hired Bernard to the newly-created position, making Plaintiffs Bernard's subordinates.  Defendant never internally or externally advertised to fill this newly-created position.  Additionally, Bernard's duties subsumed many of Plaintiffs' previous duties.  For example, Bernard, as CTO, communicated directly with Defendant's senior technology supervisors and effectively eliminated Plaintiff Carzoli from the chain of command, which divested Plaintiff Carzoli of his primary responsibilities within RFE/RL.

85.     Following Bernard's appointment as CTO, RFE/RL's senior management, including Pejic, instructed Bernard to terminate Plaintiffs' employment with Defendant.  Bernard declined to do so because Plaintiffs possessed invaluable institutional knowledge.

86.     Defendant continued its elimination of Plaintiffs' responsibilities and escalated its efforts to oust Plaintiffs from employment with Defendant.

87.     Plaintiffs continued providing information to OIG and the FBI throughout 2015.

88.     In or about September 2015, OIG travelled to Prague to conduct an on-site investigation into Plaintiffs' allegations regarding Defendant's waste, fraud, abuse of authority, and misconduct.

89.     Management officials, including Pejic, were aware that Plaintiffs participated in the investigation. Pejic witnessed Plaintiff May providing information to OIG investigators.  Upon information and belief, RFE/RL management officials also knew that Plaintiffs had contacted OIG.

90.     On or about September 15, 2015, approximately two days before Plaintiffs met with OIG investigators, Plaintiff Carzoli emailed Herman and Mendes and explicitly informed them about his upcoming interview with OIG.

91.     Within a month of participating in the OIG investigation, on October 14, 2015, Bernard met with Plaintiffs Carzoli and May individually.   During the respective meetings, Bernard showed Plaintiffs Carzoli and May a draft of a new organization chart, which indicated that Plaintiffs would be officially demoted.  For example, the draft of the new organization chart identified Plaintiff May as Acting Director of Broadcast Engineering, The new organization chart also eliminated Mr. Carzoli's role as Deputy Director of Technology demoting him to the position of Director of Project Management, a new Division with only one other employee whom Plaintiff Carzoli would supervise.

92.     During the meeting with Plaintiff Carzoli, Bernard informed Plaintiff Carzoli that RFE/RL intended to permanently adjust their positions and that they were on a "kill list."  Upon information and belief, Bernard also informed other Defendant management officials, including Luke Springer, that Plaintiffs were on a "kill list."

93.     Shortly after the October 14, 2014 meeting, in a follow-up meeting, Bernard informed Plaintiff Hanspeter that he would be demoted to Director of the Telecommunications Division and that Plaintiff Hanspeter's former deputy would oversee the Networks and Telecommunications Division.  Bernard also informed May that RFE/RL intended to advertise to fill the now vacant permanent position of Director of Broadcast Engineering.

94.     On November 1, 2015, RFE/RL issued Plaintiffs official "Addendum[s] to Employment Agreement" indicating their new positions.

95.     The November 1, 2015 Addendum stated that, aside from modifications to their position title, "[a]ll applicable terms and conditions of the agreement between the parties remain in full effect."

96.     The Addendum to the employment agreement did not modify the place of employment for Plaintiffs and Plaintiffs' designated place of employment, pursuant to their employment agreements, remained split between Washington, DC and Prague.

97.     RFE/RL provided no explanation for its decision to reassign and effectively demote Plaintiffs.

98.     That same month, Plaintiffs Carzoli and May subsequently filed whistleblower complaints with OIG under 41 U.S.C. § 4712.  In their complaints, Plaintiffs Carzoli and May alleged that Defendant was subjecting them to continuous reprisal for disclosing their concerns about Defendant's waste, fraud, abuse of authority, and misconduct.

99.     In or about mid-November 2015, Elizabeth Hallin, Human Resources Director, emailed each Plaintiff, warning them that RFE/RL intended to terminate Plaintiffs' employment if they refused to accept their reassignments.  Faced with no choice, Plaintiffs accepted their new, lesser positions.

100.     In February 2016, Plaintiff Hanspeter filed a whistleblower complaints with OIG under 41 U.S.C. § 4712.  In his complaint, Plaintiff Hanspeter alleged that RFE/RL was subjecting him to continuous reprisal for disclosing his concerns about RFE/RL's fraud and misconduct.

101.     Since demoting Plaintiffs, and through the present, Defendant continues to retaliate against Plaintiffs.

102.     Shortly after he was demoted, Plaintiff May applied to fill the vacancy of the position he previously maintained.  Upon information and belief, however, Bernard indicated that

Plaintiff May would not be hired to fill the permanent position.  RFE/RL has not selected Plaintiff May to fill his former position and the position remains vacant to date.

103.    In or around June 2018, RFE/RL revised the position description for the vacant Director of Broadcast Engineering position.

104.    Shortly thereafter, Plaintiff May reapplied for his former position, Director of Broadcast Engineering, but he has not been selected for the position.

105.    Since demoting Plaintiffs in October 2015, RFE/RL has continued to reduce and diminish Plaintiffs' responsibilities and create a work environment that interferes with Plaintiffs' ability to perform their jobs and attempts to discourage them making further reports about the fraud.  For example, in or about January 2016, RFE/RL blocked Plaintiff May's access to facilities management account in PeopleSoft, although it was later restored, which impeded Plaintiff May's ability to perform his remaining job responsibilities.

106.    Around the same time, in January 2016, RFE/RL instructed Plaintiff Hanspeter to relocate his office to a storage space, although it later rescinded its decision.

107.    Additionally, in 2016, after Plaintiff Hanspeter submitted his performance evaluation, RFE/RL retroactively changed the responsibilities listed in Plaintiff Hanspeter's performance evaluation.

108.    In or around November 7, 2017, Bernard informed Plaintiff Hanspeter that additional technicians would be removed from Plaintiff Hanspeter's purview, including Plaintiff Hanspeter's lead engineer.

109.    In or around January 11, 2018, RFE/RL announced, without consulting Plaintiff Hanspeter, that another employee on Plaintiff Hanspeter's staff would be promoted to a position outside of Plaintiff Hanspeter's team, which further reduced Plaintiff Hanspeter's staff.

110.    RFE/RL did not fill the positions of the employees removed from Plaintiff Hanspeter's team.

111.    RFE/RL did not provide any justification for its decision to remove additional staff from Plaintiff Hanspeter's team in November 2017 or January 2018.

112.    Since 2015, in addition to intentionally understaffing Plaintiffs' departments and reducing their responsibilities, RFE/RL has assigned them impossible tasks and projects to complete, and provided unjustified poor performance evaluations, which eliminated any possibility of merit based awards.  Since engaging in protected activity, Plaintiffs received the lowest performance ratings that they had ever received during their many years of employment with RFE/RL, despite their performance having remained unchanged (even though many of their duties had been removed).

113.    Since engaging in protected activity, Plaintiffs have not received any merit based awards or salary increases.  Prior to engaging in protected activity, Plaintiffs regularly received such awards and salary increases.

114.    Upon information and belief, similarly situated individuals who did not engage in protected activity have regularly received merit based awards and salary increases.

115.    Upon information and belief, Defendant continues to seek ways to terminate Plaintiffs' employment or harass them into leaving.

116.    In or around October 10, 2017, Herman emailed Plaintiffs instructing them to sign amendments to their employment agreements, which would terminate their "split" contracts. Again, faced with no choice, Plaintiffs signed the amendments to their employment agreements. Upon information and belief, although the amendments to their employment contracts do not bar their retaliation claims, they were intended to create an obstacle to Plaintiffs' ability to pursue their

claims and avail themselves of whistleblower protections, and to discourage Plaintiffs and others from pursuing claims of retaliation and reporting fraud.

117.    Defendant's repeated and continuous retaliatory acts against Plaintiffs continue to cause Plaintiffs immediate, substantial, and irreparable injury, including damaging their emotional and physical health and wellbeing.

## CAUSE OF ACTION AND REQUEST FOR INJUNCTIVE RELIEF

### Retaliation in Violation the False Claims Act 31 U.S.C. § 3730(h).

118.    Plaintiffs, Christopher Carzoli, Manfred Hanspeter, and Donald May, re-allege and incorporate the allegations set forth above as though each and every allegation is fully set forth.

119.    At all times material, Plaintiffs Carzoli, Hanspeter, and May were and remain an "employee, contractor, or agent" within the meaning of the FCA, 31 U.S.C. § 3730(h).

120.    At all times relevant, Defendant was an "employer" within the meaning of the FCA, 31 U.S.C. § 3730(h).

121.    Under the FCA, an employee has engaged in protected conduct where, as here, the employee characterizes the employer's conduct as illegal or fraudulent, or recommends that legal counsel be involved, or where the conduct reasonably could lead to a viable FCA action or litigation is a reasonable possibility.

122.    As set forth above, Plaintiffs engaged in protected activity when they reported that L88 and Defendant knowingly presented or caused to be presented false claims for payment or approval to the United States government for services and vendors that L88 did not pay.  Plaintiffs, in good faith, believed the fraudulent activity that they discovered and reported reasonably could have, and ultimately did, lead to claims under the FCA.

123.    A reasonable employee in the same or similar circumstances as Plaintiffs, would have believed that RFE/RL and L88 were committing fraud against the U.S. government.

124.    Defendant was aware of Plaintiffs protected activity because Plaintiffs reported their concerns about fraud, not only internally to senior management, including Herman, but also externally to BBG, to OIG, and to the FBI, which resulted in multiple investigations that involved interviews with RFE/RL upper management and Plaintiffs.

125.    Pursuant to the FCA, Defendant is prohibited from discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against Plaintiffs in the terms and conditions of employment because of their protected activity, but Defendant has demoted, harassed, and has otherwise discriminated against Plaintiffs in retaliation for their protected activity.

126.    RFE/RL unlawfully retaliated against Plaintiff Carzoli in violation of 31 U.S.C. § 3730(h) for engaging in protected activity and making protected disclosures when it significantly and continuously diminished his duties and responsibilities, undermined or reduced his authority, provided him with unjustified poor performance evaluations, failed to provide him with any merit bonuses or salary increases, placed him on a "kill list," demoted him to Director of Project Management, created obstacles to make it difficult for him to perform his job, and continuously assigned him tasks that were impossible to complete.

127.    RFE/RL unlawfully retaliated against Plaintiff Hanspeter in violation of 31 U.S.C. § 3730(h) for engaging in protected activity and making protected disclosures when it significantly and continuously diminished his duties and responsibilities, undermined his authority, provided him with unjustified poor performance evaluations, failed to provide him with any merit bonuses or salary increases, placed him on a "kill list", removed the Networks Department from his

supervision, removed and failed to replace his Deputy Director, demoted him to Director of Telecommunications, created obstacles to make it difficult for him to perform his job, and assigned him tasks that were impossible to complete.

128. RFE/RL unlawfully retaliated against Plaintiff May in violation of 31 U.S.C. § 3730(h) for engaging in protected activity and making protected disclosures when it significantly and continuously diminished his duties and responsibilities, undermined his authority, provided him with unjustified performance evaluations, failed to provide him with any merit bonuses or salary increases, placed him on a "kill list", demoted him to Acting Director of Broadcast Engineering, advertised his position and subsequently failed to select him for the permanent position on multiple occasions, created obstacles to make it difficult for him to perform his job, and assigned him tasks that were impossible to complete.

129. Plaintiffs Carzoli, Hanspeter, and May have suffered significant emotional and financial harm, as well as harm to their professional reputations and emotional and physical health, as the result of Defendant's retaliation in violation of 31 U.S.C. §3730(h).

130. Plaintiffs Carzoli, Hanspeter, and May are entitled to such legal or equitable relief including, but not limited to two times the amount of back pay, interest on pack pay, compensation for any special damages, including emotional distress, reasonable attorneys' fees and costs, and any other damages available by law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, Christopher Carzoli, Manfred Hanspeter, and Donald May, pray that this Honorable Court adjudge the following:

A. That Defendant be found in violation of the False Claims Act; and

B.      That Defendant be ordered to pay Plaintiffs an amount sufficient to fully compensate them (including tax consequences) for their economic losses, including two times lost wages and benefits, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation and reprisal; and

C.      That Defendant be ordered to pay compensatory (non-economic) damages, in an amount to be determined at trial; and

D.      That Defendant be ordered to reinstate Plaintiff Carzoli to the position of Deputy Director of Technology with the duties, authority, and responsibilities they held prior to their demotion; and

E.      That Defendant be ordered to reinstate Plaintiff Hanspeter to the Director of Telecommunications and Networks with the duties, authority, and responsibilities they held prior to their demotion; and

G.      That Defendant be ordered to reinstate Plaintiff May to Director of Broadcast Engineering and Technical Operations with the duties, authority, and responsibilities they held prior to their demotion; and

H.      That Defendant be immediately enjoined from any further retaliatory conduct against Plaintiffs; and

F.      That Defendant be ordered to issue a public apology to all Plaintiffs for the unlawful retaliation to which they have been subjected; and

G.      That Defendant be ordered to conduct mandatory training for all of its management officials and employees on the rights and responsibilities that the FCA's anti-retaliation provisions require; and

H.      That Defendant be ordered to post the order granting relief to Plaintiffs throughout Defendant's offices and to distribute it to all Defendant's personnel; and

I.      That Defendant be ordered to take all measures needed to prevent any further retaliation against any of the Plaintiffs including but not limited to disciplining those responsible for committing the retaliatory acts; and

J.      That Defendant be ordered to create new internal complaint procedures designed to provide an effective procedure for employees to report workplace concerns, particularly about those related to mismanagement of a Federal contract or grant, gross waste of Federal funds, abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or violation of law, rule, or regulation related to a Federal contract or grant;

K.      That Defendant be ordered to pay reasonable litigation costs, expert fees, and reasonable attorneys' fees; and

L.      That the Court grant other injunctive or equitable relief, as may be appropriate, to prevent further harm to Plaintiffs, to others, and to the public caused by Defendant's retaliation against whistleblowers; and

M.      That the Court grant any other such relief that the Court may deem just and equitable, and as the nature of the cause may require.

## **DEMAND FOR A JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and pursuant to the local rules of this Court, the Plaintiffs demand a jury trial as to all issues so triable.


Dated:                                               Respectfully submitted,


_____

Gary M. Gilbert, Esq. (Bar No. MD15808)

Cori M. Cohen, Esq. (Bar No. MD19124)
Jillian Moo-Young, Esq. (Bar No. 1045088)
*Attorneys for Plaintiffs*
Gilbert Employment Law, P.C.
1100 Wayne Ave., Suite 900
Silver Spring, MD 20910
Tel: (301) 608-0880;  Fax: (301) 608-0881
gary-efile@gelawyer.com
ccohen-efile@gelawyer.com
jmooyoung-efile@gelawyer.com